Bruce T. Moats
Law Office of Bruce T. Moats, P.C.
2515 Pioneer Avenue
Cheyenne, Wyoming 82001
(307) 778-8844
Fax: (307) 638-1227
bmoats@hackerlaw.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **FLOYD WILKERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 08-CV-0115-B** |
| | ) | |
| **JAMES B. PEAKE, Secretary,** | ) | |
| **U.S. Department of Veterans Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### *PLAINTIFF'S BRIEF IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT*

---

Plaintiff Floyd Wilkerson hereby submits his brief in support of his opposition to the Defendant's Motion for Summary Judgment:

### INTRODUCTION

Plaintiff Floyd Wilkerson alleges employment discrimination in violation of the Rehabilitation Act and Age Discrimination in Employment Act. Defendant has moved for summary judgment on both claims.

Plaintiff has filed to amend his Complaint to include Privacy Act claims because of the illegal release of his patient records to VA management as part of a personnel action. The motion is

pending.

## FACTS

Floyd Wilkerson, a 6 foot 3 inch, 338-pound man, had been working as a boiler plant operator at the Cheyenne VA Medical Center for more than two years when he was notified that he had failed a physical examination and must be reassigned as a housekeeping aid.

Sandra Willoughby, the human resources director, informed Wilkerson in a March 21, 2007, letter that he did "not meet the physical requirements of the position.  Specifically, the Medical Review Officer indicates you do not meet the environmental requirements for work as a Boiler Plant Operator because your weight exceeds the 300-pound limitation of the ladders and lifts required to accomplish the duties of an Operator." *Exhibit 1.*

Wilkerson's pay grade was reduced from WG-10 to WG-2, and his hourly pay was slashed from $21.98 an hour to $12.51 an hour.  *Exhibit 2.*

The Medical Review Officer, Dr. James Johnson, signed off on the Certificate of Medical Examination on March 21, 2007.  Under the section of the document titled, "Recommendation," Dr. Johnson checked the box next to  "Hire or Retain -- Describe Limitations If Any Here."  He did not mark the box titled, "Take Action to Separate Or Do Not Hired.  Explain Why."  Dr. Johnson wrote in this section, "This employee no longer meets the environmental factors requirements for working as a boiler plant operator.  His obesity with a weight of 338 pounds exceeds the 300-pound wt. limit of ladders.  He currently does not meet the requirements to be employed as a boiler plant operator." *Exhibit 3.*

The Certificate does not list any medical tests that he failed.

The actual physical examination was conducted by Ann Enlow, a VA nurse practitioner, on

February 1, 2007, a month and three weeks before Dr. Johnson signed off on document. *Exhibit 3*. She noted that Wilkerson was obese, had diabetes, but that he denied any dizziness. She noted at the bottom of page 2 of the form: "Not sure he would fit in boiler for cleaning. Is shortwinded [with] exertion." Enlow left the decision whether Wilkerson could do his job to Dr. Johnson. *Enlow Depo., p. 25*.

His physical examination was conducted in the context of an effort by the engineering department to have the physical examination requirements for boiler room operators stiffened. A requirement that the operators taking the physical must be able to walk up and down three flights of stairs without stopping was added. *Exhibits 4, 5; Willoughby Depo., pp. 36-37; Wrede Depo, pp. 20-26*. The effort began after another overweight operator, Robert Reed, began bringing an oxygen bottle into work. Engineering wanted him removed, but human resources allowed him to stay. *Wrede Depo., p. 23*.

Wilkerson stayed in the boiler room for two years because other operators were on extended leave because of medical conditions. He was not required to take a physical examination when he started in the boiler room, nor after his first year there.

Wilkerson is also seen by medical providers at the VA as a veteran patient. After Dr. Johnson received Enlow's report, he decided to access Wilkerson's patient records, although he had not sought Wilkerson's permission.[1] The patient records are kept on an electronic medical records system. *Johnson Depo., p. 16*. Dr. Johnson was "knowledgeable that he had diabetes and so I

---

[1]Nelda Atwood, the Occupational Health Clerk at the Cheyenne VA, and Sandra Willoughby, now retired as the center's human resources director, both testified that it is improper for occupational health or human resources to access the patient records of a veteran in a personnel matter. *Atwood Depo., pp. 21-22; Willoughby Depo., p. 46.*

wanted to see where things were in terms of his diabetes management." *Id.* at 17.

Dr. Johnson testified he spoke with Enlow about the exam, although she does not recall any conversation. *Johnson Depo., pp. 18-21; Enlow Depo. p. 26.* He recalled that she was concerned that he was "overweight, that he wouldn't be able to respond in a timely manner to emergencies and that his size would preclude him from fitting into areas that needed to go and that his diabetes was poorly controlled." He recalled they discussed that "maybe this will be an incentive for him to get his diabetes controlled better." *Johnson Depo. pp. 21-22.*

Dr. Johnson, who had never been in the boiler room, then met with representatives of the engineering department and human resources to discuss whether Wilkerson could meet the functional requirements of the job. *Exhibit 4; Johnson Depo., pp. 17-18.* He got input from Wilkerson's supervisors about his "weight and ladder strength and how much those ladders could accommodate," as well and their opinion "concerning his ability to meet those functional requirements." *Id.* at 19. The supervisors implied to him that Wilkerson would need to quickly respond to warning bells and gauges, and that he "needed to be able to climb ladders and go up and down stairs quickly." *Id.* at 22-23. Wrede had witnessed an incident about a year before Wilkerson's removal where he perceived Wilkerson as being unsteady while climbing a ladder to get to the top of a boiler. *Wrede Depo., pp. 31-33, 39.* Wrede testified that if he believed someone was being unsafe in the boiler room he would not let that situation continue. *Wrede Depo., pp. 47-48.* He did not raise to anyone after the incident that he felt Wilkerson was a danger to himself or others, and something must be done. *Wrede Depo., p. 41.*

Retired boiler room operators state that there is no need to respond in haste to warning bells, and operators must travel a short distance to do so. An operator is more likely to get into trouble if

they rush. *Declaration of Robert Reed, ¶2; Declaration of Wilbur Job, ¶ 2.*

The boilers are equipped with redundant devices that shut down the boilers if they malfunction, rendering the possibility of a boiler tube rupture "very inconceivable." *Job Depo., p. 21; Wooten Depo., pp. 9-15.* Since the VA got new boilers in 2003, they have only shut down due to malfunction once or twice. *Wrede Depo., p. 28; Job Depo, p. 12.* When that happens, a reserve boiler is started if the operator is not able to correct the problem with the first. *Wrede Depo., p. 29.*

Dr. Johnson usually signs off on the Certificate of Medical Examination within a week of the physical examination, and could not explain why it took him almost two months this time, other than the need to talk with Wilkerson's supervisors. *Id.* at 19-20.

Wilkerson had received satisfactory ratings on his performance evaluations in 2005 and 2006, and no job performance deficiencies were documented. *Exhibit 6; Wrede Depo, pp. 45-54.* Wilkerson's temporary assignment to the boiler room had to be extended on several occasions, and no one objected that he was unsafe or the assignments should not be extended because of performance reasons. *Willoughby Depo, pp. 26-30; Anselmi Depo, p. 16.* Robert Anselmi, VA engineering chief and Wilkerson's second-line supervisor, stated that "we considered his work satisfactory and did not see any reason not to continue extending him." *Anselmi Depo, p. 16.* The last extension of his assignment to the boiler room was effective December 16, 2006, about three months before his removal. *Exhibit 2.* The VA had originally sought out Wilkerson to work in the boiler room because of his previous experience. *Anselmi Depo., pp. 12-13.*

After he received the letter from Willoughby, Wilkerson asked her if ladders could be purchased that would accommodate his size. Willoughby called Wrede about purchasing such ladders. He replied that they could get them but "Floyd was out of the boiler plant then so we didn't

need them." *Wrede Depo., pp. 36-37.*

Wilkerson continues to work in housekeeping today, where he has been often required to climb on ladders. *Declaration of Wilkerson, ¶ 3.*

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment is only appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Widnall v. Williams*, 79 F.3d 1003, 1005 (10th Cir. 1996). When considering a summary judgment motion, the court "must take the facts alleged by the employee to be true." *Burlington v. Ellerth*, 141 L.Ed. 2d 633, 644 (1998).

Summary judgment should be denied unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1378 (10th Cir. 1994). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party." *Kidd v. Taos Ski Valley*, 88 F.3d 848, 851 (10th Cir. 1996). Summary judgment is granted only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position. *Davis v. U.S. Postal Service*, 142, F.3d 1334, 1339 (10th Cir. 1998). The court examines the evidence in the light most favorable to Mr. Wilkerson, extending to him the benefit of all reasonable inferences. *Id.*

Plaintiff had demonstrated during two years on the job that he was qualified to perform the essential functions of the boiler plant operator position at the VA Medical Center in Cheyenne, contrary to Defendant's primary assertion that he was not a qualified individual pursuant to disability discrimination law.

A prima facie case of disability discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the law; 2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held; and 3) suffered discrimination by an employer because of that disability. *Justice v. Crown Cork*, 527 F.3d 1080, 1086 (reversing summary judgment granted to an employer who argued that the plaintiff, an electrician, could not safely perform his job).

## II.     EVIDENCE SHOWS WILKERSON COULD DO THE JOB

The primary thrust of Defendant's motion for summary judgment is that Mr. Wilkerson fails to meet the second prong, i.e., that he is not qualified to perform the essential functions of the boiler room operator position.

The facts show otherwise. Mr. Wilkerson received satisfactory ratings on his performance appraisal throughout the more than two years when he was assigned to the boiler plant. Safety was one of the criteria on the performance appraisals, and the documents cite no safety concerns. Wilkerson's "temporary" assignment to the boilerroom was extended several times, and no one objected that he could not do the job or was unsafe. *Anselmi Depo., p. 16.* His supervisor, Elvin Wrede, said he would not have let an unsafe condition continue in the boiler room. *Wrede Depo., pp. 47-48.* Further, Wrede testified he "fully expected to keep [Wilkerson] as a boiler plant operator" when a "permanent" position became available. *Wrede Depo., pp. 34-35, 74-75, Exhibit 4.*

Joe Wooten, who worked with Wilkerson and is now the working supervisor in the boiler room, said he would not mind if Wilkerson returned to the boiler room. *Wooten Depo., p. 9.* Wilbur Job, who worked in the boiler room for 17 years at the Cheyenne VA before retiring, testified

that Wilkerson did whatever Job asked him to do. *Job Depo., p. 16.*   Tony Salas, another operator who worked with Wilkerson before retiring, testified that Wilkerson was a "good worker," and was able to perform the duties of the position. *Salas Depo., pp. 26-27, 30.*

Salas observed Wilkerson climb a ladder to get on top of the boiler and he did not have any concerns. *Salas Depo., p. 28.*   Wilkerson's co-workers agreed that they are required only occasionally to climb on ladders. *Salas Depo, p. 27; Reed Depo., p. 36; Job Depo., pp. 36-37.* Months would go by without the need to get on a ladder. *Job. Depo., p. 37.* The only operator who fell off a ladder was Bill Greer, who was not a large man. *Reed Depo., p. 36.*

The only arduous work that the boiler room operators had to perform was opening the boiler room doors. *Job Depo., pp. 23, 37; Salas Depo., p. 12.* Salas needed Wilkerson's help in opening and closing the doors, as Salas was a "little guy" and Wilkerson's size was an asset. *Salas Depo., p. 29.*

The testimony of the boiler plant operators indicates that most of their job involved sedentary duties.   Approximately 95 percent of the work Wilkerson performed was light. *Wilkerson Depo., pp. 181-83; Job Depo, pp. 35-37.* The VA's job description for the boiler room operators confirms that most of the job requires light effort.   Under the heading of "Physical Effort," the description states: "Although the *major portion of my time is spent doing light duty work,* there are times when I am required to perform heavy, hard work when working on boilers and steam systems." *Exhibit 7.*

Again, Wilkerson was able to perform the arduous work, opening and closing boiler doors, better than his smaller colleagues.

The overwhelming weight of the evidence indicates that Wilkerson was able to perform the

duties of his job, and to do so safely.  The evidence, at the least, demonstrates that there is a material issue of fact that must be resolved by a jury.

## III.    CHANGING REASONS FOR REMOVAL PROVIDE JURY WITH EVIDENCE OF PRETEXT

Defendant now argues that the reason officially given by the VA for removing Wilkerson from the boiler room was not the real reason it removed him.  In her letter to Wilkerson informing him officially of his removal, Sandra Willoughby does not cite his diabetes or his ability to do arduous work.  Instead, she says that he weighs more than the weight limitation on the ladders. Willoughby testified that she did not want to put a recitation of Wilkerson's health issues in the letter to Wilkerson.  She admitted that the letter would not be a public document and that Wilkerson would already know his health conditions.  She could not explain why she did not mention any issues other than his weight and the limitations of the ladders in her letter, finally stating, "That was just my decision at the time."  *Willloughby Depo., pp. 11-13.*

Dr. James Johnson, the medical review officer, also did not cite any factor other than his obesity and exceeding the 300-pound weight limit of the ladder.  Dr. Johnson testified that he only cited Wilkerson's obesity because that was a "no-brainer" and no one could argue about what he weighed, while they could argue about the effect of his diabetes on his ability to do the job.  *Johnson Depo, p. 42.*

The VA has now spent considerable effort to persuade the Court that his obesity, specifically that his weight exceed the capacity of the ladders in the boiler room, was not the real reason for his removal from the boiler room.  An employer's reasons for a personnel action against a plaintiff can be shown to be pretextual by "weaknesses, implausibilities, inconsistencies, incoherencies or

contradictions in the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons." *Bryant v. Farmers Insurance Exchange*, 432 F. 3d 1114, 1125 (10th Cir. 2005).

The VA has been nothing but inconsistent and incoherent in its proffered reasons for removing Wilkerson from the boiler room. A reasonable jury could rationally find their reasons to be unworthy of belief and infer that the VA acted in a discriminatory manner because officials believed that he was disabled by his obesity.

## IV.     FAILURE TO PROVIDE CIVIL SERVICE PROTECTIONS ALSO EVIDENCE OF PRETEXT

Further, pretext can be shown by evidence that the defendant acted contrary to a company policy or regulation. *Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). In this case, Wilkerson had a right to civil service protections because he had been in the boiler room job for more than two years. The VA Handbook 5005 states: "Where an employee has occupied an interim position under a temporary promotion for more than 2 years, any action taken to place him in another position must observe adverse action procedures where applicable." *Exhibit 8 – VA HandBook 5005, Part III, Chapter 3, p. III-23.* The handbook cites 5 CFR 752.301 as requiring the civil service protections for someone in a temporary position for more than two years. The VA did not provide Wilkerson with any of the civil service protections he should have been afforded pursuant to federal regulations. The VA simply moved him and reduced his pay grade and salary without due process or recourse, or the need to justify its actions.

A jury could reasonably infer from this failure to follow its own rules that the VA was acting

against Wilkerson with discriminatory intent.

The jury must be allowed to determine whether the VA acted with discriminatory intent.  As the Tenth Circuit has said:

> It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini-trial' to determine the defendant's true state of mind.  So long as the Plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury.

*Randle v. City of Aurora,* 69 F. 3d 441, 453 (10th Cir. 1995).

Summary judgment should seldom be used in employment discrimination cases.  *EEOC v. PVNF, LLC*, 87 F.3d 790, 796 (10th Cir. 2007), citing *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

## V.   INTERACTIVE PROCESS CIRCUMVENTED BY VA'S LACK OF CANDOR

The VA's purported failure to cite the real reasons for removing Wilkerson from the boiler room is contrary to the grant of summary judgment for another reason.  An employer is obligated to engage in an "interactive process" once it has reason to believe an employee is unable to do the job because of a health condition.  The purpose of the interactive process is to determine if any accommodations may be made that would enable the employee to continue to work.  *Smith v. Midland Break, Inc.*, 180 F.3d 1154, 1171-73 (10th Cir. 1998).

It is undisputed that Mr. Wilkerson asked if the VA could accommodate him by purchasing ladders with weight limits that would handle his size.

If Wilkerson had been told that it was his management of his diabetes that was the real reason for his removal from the boiler room, he could have engaged the VA in the interactive process to see if he could get certification from his doctor regarding his ability to continue to work in the boiler

room or have time to get his diabetes under control to the satisfaction of the VA, or to come up with other accommodations that would enable him to continue to do the job he had done satisfactorily for two years.

Despite Wrede's concern triggered by his observation of Wilkerson on the ladder, Wrede testified he was prepared to keep him in the boiler room permanently. Wrede testified he would have given him the opportunity to prove his ability to do the work safely. *Wrede Depo., pp. 34-35.* He was never given that opportunity because the VA either considered him too obese to do the job, or the agency was not honest with him about its concerns about his diabetes.

If the real reason for his removal was the diabetes, Wilkerson could have asked for an opportunity to bring it under the control, possibly including time off to do so. Recovery from a medical condition can be a reasonable accommodation. *Cisneros v. Wilson,* 226 F.3d 1113, 1128-29 (10th Cir. 2000).

In fact, Wilkerson did meet the criteria for control of his diabetes shortly after his removal. He went on insulin in May of 2006 and that helped to get better control of his diabetes. In her June 27, 2006, Dr. Gergana Popova concluded that his blood sugar numbers had gotten "much better. *Popova Depo., pp. 41-42.* On April 12, his AIC result – a measurement of his average blood sugar – improved from more than 10 in the past to 8.7 on April 12, 2007, just a few days after his removal. Dr. Johnson characterized this as "fair control." In October of 2007, his AIC had dropped to 7.3 which Dr. Johnson characterized as "good control." *Johnson Depo., p. 64.*

Either stereotypical thinking about his obesity or the failure of the agency to be honest with him stopped the "interactive process" before it could get started. The failure of the VA to engage in the interactive process is a violation of the disability law in itself. *See Smith v. Midland Brake,*

*supra.*

## VI.   WILKERSON NO MORE A DIRECT THREAT TO SAFETY THAN AVERAGE WORKER

The VA's purported reason for removing Wilkerson from the boiler room that has been adopted for this litigation - his diabetes – is based on the fear that his health may cause him to become incapacitated while on the job.   The VA appears to be asserting a form of direct threat defense, although it does not expressly so state in its motion.

The term "direct threat means a significant risk to the health and/or safety of others that cannot be eliminated by reasonable accommodation." *Crown Cork*, 527 F.3d at 1091.   In determining whether an individual would pose a direct threat, the factors to be considered include: 1) the duration of the risk; 2) the nature and severity of the potential harm; 3) the likelihood that the potential harm will occur; and 4) the imminence of the potential harm.   *Id.*

The burden of showing that an employee is a direct threat typically falls on the employer, though it can be shifted to the employee if the safety of others is implicated.   *Id.*

The potential harm cited by the VA is a hypoglycemic event that would render Wilkerson unable to perform his duties or to fall off a ladder or boiler if the event would happen to occur on the rare incidences when he was on a ladder or boiler.   Importantly, there is no evidence in the record that he ever experienced a hypoglycemic event, or that his diabetes caused an unsafe situation at work.   The diabetes did not interfere with his ability to do the job and do it safely.   *Wilkerson Depo., pp. 103-04.*

The duration of the risk of a fall is not great, as the boiler room operators all testified that they are seldom on ladders.   This risk is present for so-called healthy operators as well as those with

diabetes.  The only operator to have fallen off a ladder in recent years was Mr. Grier who was not overweight. *Reed Depo., p. 36.*

If Wilkerson was unable to function because of his diabetes, it is likely that the boilers would continue to operate by themselves unless a malfunction occurred.  If a malfunction occurred, then the boilers would all but certainly just shut down because of the numerous safety devices.  *Job Depo., p. 21; Wooten Depo., p. 9.*  In his 26 years working around boilers, he had never seen a boiler explosion, including working through an earthquake in California. *Id.*  Wooten testified it was "very inconceivable" that every safety mechanism on the boilers would all fail. *Wooten Depo., p. 15.*

The VA claims that an operator working alone on the evening or graveyard shift could get hurt, and no one would be there to help them.  However, the VA has a policy that security is to check on the operators once an hour.  The VA also has a policy that if the operators are required to do repairs, including climbing on ladders, that they wait until another operator can assist them. *Wrede Depo., pp. 41-43.*  This potential harm is obviously as true for so-called healthy operators as well as those with diabetes.

Therefore, the nature of the harm purportedly feared by the VA is as slight as is its likelihood.

The imminence of the harm for a person with diabetes or other health condition is difficult, if not impossible, to predict.  Dr. Gergana Popova, a treating physician of Plaintiff cited by Defendant in its brief, testified that predicting when a medical condition might result in some adverse event is "impossible." *Popova Depo., p. 52.*  Dr. Jim Johnson testified that the "timing of an onset of an adverse effect is fraught with error and similar to – I never tell a person when they are going to die. I would not tell them when they're going to have a bad outcome." *Johnson Depo., p. 68.*

Although potential complications from diabetes might occur that would prevent Wilkerson from doing his job, there is the same risk for a person who has not been diagnosed with diabetes. Both Bob Reed and Wilbur Job were allowed to continue working in the boiler room after being diagnosed with serious heart conditions. *Reed Depo., pp. 14-15, 32-34; Job Depo., pp. 7-8, 37-38.* Certainly, a person with a heart problem could have a heart attack and fall off a ladder or lose consciousness. *Johnson Depo., p. 40.*

Smokers have a higher risk than non-smokers of heart disease, as do people with a history of heart disease in their family, but the VA does not prevent them from working in the boiler room. *Johnson Depo., pp. 40, 50.*

As the Tenth Circuit found in *Crown Cork,* there is evidence in this case that the plaintiff could perform his job safely despite his medical conditions. This evidence prevents the issue from being decided at summary judgment. *Id.* at 109-92. Even if the risk of harm is permanent (though it arguably is not in this case because his diabetes could be controlled) and the severity of the harm great, "a reasonable jury could conclude that the likelihood of the harm was extremely small" and that Wilkerson did not pose a direct threat to safety. *Id.*

A triable issue of material fact exists as to whether Mr. Wilkerson posed a direct threat to plant safety, and summary judgment is not appropriate on this issue.

## VII.   CASE REQUIRES APPLYING MEDICAL OPINION TO THE WORKPLACE

The VA points to their own guidelines that states "uncontrolled diabetes" should be considered to exclude the person from working in the boiler room. The VA is, in essence, asking that the jury not be allowed to second guess the VA's blanket determination that such a condition is exclusionary. This argument was rejected by the Tenth Circuit in *Crown Cork,* for several

reasons:

> First, allowing the case to go to a jury would not require second-guessing the medical judgments involved - it would only require second-guessing [the employer's] application of those judgments to the workplace . . .. Second, to hold that one cannot second-guess an employer's conclusion regarding the safety risks posed by an employee would eviscerate the ADA's protections by permitting the employer to assert in nearly every case that it believed the employee's medical limitations posed a credible threat to his safety or the safety of others.

*Id.* at 1092, n.5.

The VA cannot hide behind a discriminatory policy or guideline, or a discriminatory application of the policy or guideline.

Nurse Enlow and Dr. Jim Johnson testified that he relied on the VA to determine what requirements were necessary for the boiler plant operator and it did not matter whether he agreed with them or not.  His job was to apply the requirements and not question them.  *Johnson Depo., pp. 50-51; Enlow Depo. p. 33.*  Dr. Johnson, in signing off on the Certificate of Physical Examination, was not making a medical determination as to whether the requirements were necessary for the job, but simply that Wilkerson did not meet them.

Further, Dr. Johnson had never been in boiler room at the Cheyenne VA and did not have independent knowledge of the duties performed by the boiler room operators there.  Nurse Enlow never observed Wilkerson perform his duties in the boiler room.  *Enlow Depo. p. 24.*

After Dr. Johnson became concerned about whether Wilkerson passed the physical, he went to see his boss, Dr. Roger Johnson.  Dr. Roger Johnson convened a meeting with safety officer Steve Legg, a representative from engineering whom he believed to be Wrede, and a representative from human resources.  This meeting occurred in the context of an effort by Wrede and engineering to stiffen the physical examination requirements for boiler room operators.  Dr. Johnson took nearly

two months to sign off on the Certificate of Medical Examination.

Dr. Jim Johnson recalled Wilkerson's "supervisors saying I have a concern about him meeting the functional requirements.  And I got input from them concerning – I specifically recall weight and ladder strength and how much weight those ladders could accommodate."  After receiving the input from Wilkerson's supervisors, he decided "at that point to indicate that he did not meet the functional requirements." *Johnson Depo., p. 19.*

Wrede had also expressed concern about other overweight employees being on ladders in the past.  He had "hassled" boiler operator Robert Reed about his size.  Reed weighed about 230 pounds at the time.  He would ask him if he felt safe up on a ladder.  *Reed Depo., p. 35.*

When Wrede saw another VA subordinate, who worked in the boiler plant building but not in the boiler room itself, on a ladder, he remarked: "You don't need to get your fat butt up the ladder.  Get down." *Montee Depo., pp. 12-13.*  The employee, Nicholas Montee, weighed 230 pounds at the time.

Montee perceived Wrede to be singling out Wilkerson, Reed and himself for unfair treatment.  He testified in all three cases the individuals were overweight. *Montee Depo., pp. 11-12.*

Montee overheard a conversation between Wrede and another person, who he believed was Robert Anselmi, then director of engineering, in which Wrede said he was going to get new weight restrictions in the boiler room.   *Montee Depo., pp. 14-17.*

Further, management made the ultimate decision to return Wilkerson to housekeeping.  In fact, the decision was made by Elvin Wrede and Sandra Willoughby. *Exhibit 4, Interrogatory No. 3; Willoughby Depo., pp. 35-36.*

At the time the decision on Wilkerson's ability to stay in the boiler room was being

considered, his supervisors were lobbying to have the physical requirements for boiler plant operators stiffened after Bob Reed came to work with an oxygen bottle. *Willoughby Depo., pp. 15-19.* The Cheyenne VA now requires operators to go up and down three flights of stairs twice without stopping as part of the physical examination, although there is no corresponding job duty for boiler room operators. *Wrede Depo., pp. 30-31; Reed Depo, p. 41.*

As in *Crown Cork,* this is not a case of the VA simply following a medical judgment, it is the application of those judgments to the workplace that is at issue.

A jury should decide whether the Floyd Wilkerson, in light of the evidence that he satisfactorily performed the duties of the job for two years prior to his removal, was qualified to perform his job, or whether the VA acted out of prejudice because they saw him as obese and unhealthy.

## VIII.   CROWN CORK DECISION PROVIDES GUIDANCE

The facts and issues presented in the    *Crown Cork* case are similar to this case and the decision may provide guidance to the Court.

David Justice, the plaintiff in *Crown Cork,* was an electrician who suffered a stroke that impaired his ability to see, speak, walk, balance and care for himself. He was withheld from work for a short period of time, but released with several restrictions: "He should not work at heights on ladders or scaffolding. His balance is impaired."

While he was working under those restrictions, the employer did not document any safety problems with his performance and considered him a valuable employee. In this case, Wilkerson was rated satisfactory in his performance appraisals and the VA was ready to put him on permanently in the boiler room. Justice continued to work at the plant for two years. Wilkerson worked in the

boiler plant for two years before his removal.

Justice was observed by managers as being unsteady and this raised a concern for safety. Likewise, Wilkerson's supervisor alleges that he observed Wilkerson being uneasy while on top of a boiler, and the VA management has cited safety as the reason for his removal from the boiler room. Crown Cork required that Justice undergo a functional capacity evaluation (FCE) by a physical therapist. Wilkerson underwent a physical examination but no FCE. The physical therapist toured the plant to observe the areas where the electricians worked. There was a question whether the information supplied accurately outlined the requirements of the electrician position. Likewise, Ann Enlow, the nurse practitioner who conducted Wilkerson's physical examination, toured the boiler room with Wrede and safety man Steve Legg. She did so at the time of the issue with Bob Reed's oxygen bottle. *Enlow Depo., pp. 8-9.* In her physical examination report, Enlow expressed a concern about Wilkerson's ability to get inside the boilers to clean them. However, at the time of the physical examination, there was no longer a need for the operators to get inside the boilers to clean or work on them. *Salas Depo., pp. 28-29.* Dr. Johnson did receive information from management about the requirements of the boiler room operator position in a meeting with representatives of human resources and engineering, where concern about Wilkerson's steadiness on ladders was raised. Neither Wilkerson nor a union representative were at the meeting.

Although the physical therapist who conducted the FCE recommended that Justice seek other employment, she left the final decision about his ability to perform the electrician's job to the corporate medical director. Likewise, Enlow did not make a determination of Wilkerson's ability to do the boiler job, but left that to Dr. Johnson. The Crown Cork medical director opined that Justice should not work in an assignment that requires him to maintain his balance, work at heights

or near moving equipment, but he did not specifically state whether Justice could be permitted to continue his job as an electrician.

In this case, Dr. Johnson marked that Wilkerson should be retained as an employee, but commented he did not meet the environmental factors of the position, specifically his weight exceeded the limits of the ladders in the boiler room. Dr. Johnson did testify that he determined Wilkerson could not safely perform his duties because of his diabetes, after getting input from Wilkerson's supervisors.

After the medical director's report, Justice was told he could not work as an electrician and was reassigned as a custodian. Likewise, Wilkerson was told that he could no longer work in the boiler room and was reassigned to housekeeping.

In another similarity between the two cases, Justice argued that he was exposed to dangerous machinery in his custodian job just as he was as an electrician, which the Court said indicated that the employer may not have sincerely believed that the machinery posed a danger to the plaintiff. *Id.* at 1091. Wilkerson performs arduous tasks and has had to climb ladders in his housekeeping position. *Declaration of Wilkerson, ¶¶ 2-3.*

In reversing summary judgment, the Tenth Circuit rejected Crown Cork's argument that when it removed Justice from his position as an electrician, it was only acknowledging his medical restrictions. The Court refused to resolve a material issue of fact of whether the safety concerns of the employer "were either imagined or exaggerated, and that Crown's purported reliance on Justice's medical restrictions was a pretext masking Crown's irrational fears about Justice's condition." *Id.* at 1089.

The jury must be allowed to decide the same issue in this case. A jury must decide whether

Wilkerson was a threat to safety in the boiler room or that the VA held irrational fears given his two years of satisfactory performance in the boiler room, the intention to keep him there permanently, the support of his co-workers, the changing reasons for his removal, the unauthorized release of his patient medical records, and the only occasional need for boiler plant operators to work at heights.

The Tenth Circuit pointed to the fact that Justice had worked safely under the medical restrictions for two years prior to his removal, thus raising an inference that he was able to do the job. The same applies to Wilkerson.

As in *Crown Cork,* there is evidence in the record that Wilkerson was qualified to work as a boiler room operator notwithstanding his medical conditions and his removal was due to unsubstantiated concerns about the dangers posed by his medical condition. *Id.* at 1089, n. 3.

## IX.   WILKERSON HAS DISABILITY AS DEFINED BY LAW

### A.   Wilkerson has actual disability.

Defendant incorrectly contends that plaintiff cannot show that he has an actual disability.

It is clear from the Defendant's own brief that his medical condition limits his major life activities of breathing, walking[2] and eating. Defendant's brief is replete with reference to Wilkerson becoming winded. His diabetes limits his ability to eat certain foods as well as when he eats.

Defendant asserts that Wilkerson's morbid obesity cannot be regarded as an impairment, as it is not a physiological disorder[3]. The VA cited cases from outside the Tenth Circuit in support of

_____

[2] Walking is substantially limited if an individual "can only walk for very brief periods of time." 29 C.F.R. pt. 1630, app. § 1630.2(j).

[3] Dr. Popova diagnosed Wilkerson as being morbidly obese. *Popova Depo., p. 30.* A cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese or suffers from a weight condition that is the symptom of a physiological disorder. *Cook v. State of Rhode Island, Dep't of Mental Health, Retardation, and Hosps.,* 10

this argument.

Even if the Tenth Circuit was to adopt this requirement, the testimony of the VA's Dr. Jim Johnson undercuts its argument.  Dr. Johnson testified that Wilkerson's "weight is a manifestation of his diabetes.  If his diabetes is well controlled, he loses weight, his blood sugars are controlled, his hemoglobin A1c is better than it has been, and it's all encompassing, his weight and his obesity is part and parcel of his diabetes problem."

Defendant cannot argue that diabetes is not a physiological condition, or that Wilkerson is not morbidly obese.

**B.      VA perceived Wilkerson to have disability.**

The Defendant's contention that it did not perceive that his physical impairments of obesity and diabetes did not substantially limit a major life activity is without merit.

Again, Defendant's brief is replete with reference to his inability to catch his breath, to walk short distances, to perform arduous work, to ambulate without difficulty, to maintain his balance, to work around machinery or to work alone.

Defendant perceived Wilkerson to be substantially limited in the major life activities of breathing[4], walking and working.

In order to show that one is perceived to be disabled in the major life activity of working, he must show that he was considered to be unable to perform a class of jobs or a broad range of jobs in different classes.  29 C.F.R. Sec. 1630.2( j )(3).

---

F.3d 17, 25 (1st Cir.1993); *Francis v. City of Meriden*, 129 F.3d 281, 286  (2nd Cir. 1997).

[4]In her examination of Wilkerson, Nurse Enlow related the short-windedness she perceived to his obesity. *Enlow Depo., pp. 23-24.*

Defendant perceived Wilkerson as being unable to perform the class of jobs related to boiler room operation. It is undisputed that the duties of boiler room operators are similar across the country, and if Wilkerson could not perform the job here he could not perform it in any boiler room. *Job Depo., p. 24.* Therefore, just as the plaintiff was considered to be disabled from general employment as an electrician in *Crown Cork,* Wilkerson was perceived not to be employable in the class of jobs of boiler room workers. *Crown Cork,* 527 F.3d at 1087.

His perceived inability to catch his breath, perform arduous work or to work alone would make him unemployable in a broad range of jobs that required one to not get winded, perform arduous work or to work alone.

The fact that Wilkerson was reassigned to housekeeping does not preclude a jury from finding that the VA perceived him to be disabled in the major life activity of working. Again, the *Crown Cork* decision provides guidance here. *Id.* at 1088. First, the fact that the VA was willing to consider him for a single job does not negate Wilkerson's assertion that it considered him disabled in a class of jobs or a broad range of jobs. "Neither requires a belief that [Wilkerson] is disqualified from every job imaginable." *Id.*

The Tenth Circuit distinguished the case from *McGheshick v. Principi,* 357 F.3d 1146 (10th Cir. 2004), the same case cited by Defendant here. The Court said that in *McGheschick,* no evidence indicated that the employer considered the plaintiff to be unable to do any job but the particular housekeeping job at issue. Also, the employer offered the plaintiff to apply for other "jobs." *Id.* at 1089.

A material issue of fact remains as to whether the VA perceived Wilkerson to be disabled in either working, breathing or walking.

## X.     AGE CLAIM PRESENTS FACTUAL ISSUE

Plaintiff's age discrimination claim must also survive summary judgment. Supervisor Elvin Wrede told retired boiler plant operator Robert Reed that he was frustrated by having to complete a work schedule when the operators are continually out on extended medical leave. Wrede told Reed: "Maybe I need to hire young people so I don't have to go through this, or something like that, to that effect." *Reed Depo., pp. 26-27.* Wrede made the statement on more than one occasion. *Reed Depo., pp. 34-35.*

The Tenth Circuit has ruled that age does not have to be the sole factor for a personnel action. The Court said:

> An ADEA plaintiff is not required to show that age was the sole motivating factor in the employment decision. [Citations omitted] Thus, a plaintiff need not prove that the reasons offered by the defendant are false if he proves that age was also a reason, and that age was the factor that made a difference.

*E.E.O.C. v. Prudential Federal Saving and Loan,* 763 F.2d 1166, 1170 (10th Cir. 1985).

This evidence presents an issue of material fact as to whether age was a motivating factor in Wilkerson's removal from the boiler room. The VA did not want to keep Wilkerson, a 52-year-old with medical issues, in the boiler room.

Wrede's intolerance for those with medical conditions is confirmed by the experience of VA employee Nicholas Montee. When Montee was first hired, Wrede objected because he was placed noncompetitively because of his disability. Montee has Type II diabetes and reflex sympathetic dystrophy, which affects his joints and his balance. After Montee underwent surgery in November of 2006 or 2007, Montee was placed under the supervision of Wrede. Montee was moved to an office which required him to go up and down stairs, which can often result in accidents because of his condition. He asked for a different office, but Wrede declined. When Montee went to the next

level supervisor, Wrede set him up in an office that was in a cold stairwell.  The office had no privacy.  It was quite cold in the winter as it was next to the front doors to the building, and this adversely affected his condition.  *Montee depo., pp. 17-18.*  Montee filed an EEO complaint and the matter was settled by giving him another job in which Wrede was not his supervisor.

A reasonable jury could find that Wrede did not want any more older workers with health problems to work in the boiler room.

## CONCLUSION

Issues of material fact exist as to whether the VA discriminated against Wilkerson because of his disability and/or his age.  Therefore, Plaintiff Respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety.

DATED this ⹂⹂⹂ day of December, 2008.

FLOYD WILKERSON, Plaintiff

By: _Bruce J. Moats_

Bruce T. Moats (WY Bar No. 6-3077)
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this ⹂⹂⹂ day of December, 2008, a true and accurate copy of the foregoing ***PLAINTIFF'S BRIEF IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT*** was delivered to the Court via the CM/ECF system, and thereby also delivered to counsel for Defendant.  The same was also served via U.S. Mail, postage prepaid and correctly addressed to:

Steven K. Sharpe
steven.sharpe@usdoj.gov
U.S. Attorney's Office
P.O. Box 668
Cheyenne, WY 82003-0668

_Francine M. Baker_